USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_12/6/2018_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
QIYUAN SHI,                                      :         17-cv-2354 (RWL)
                                                 :
                        Plaintiff,               :         __DECISION AND ORDER__
                                                 :
            - against -                           :
                                                 :
ANDREW ASENSO GYAMERA, CYNTHIA                    :
STEWART, GASANDY VENTURES LLC,                    :
CARS BY CYNTHIA LLC, and JOHN DOE,               :
a.k.a. JOHN BARON ROYAL,                          :
                                                 :
                        Defendants.               :
------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

　　This breach of contract case was tried to a jury, which found in favor of the Plaintiff

Qiyuan Shi against Defendants Andrew Asenso Gyamera and Gasandy Ventures LLC

("Defendants").  Defendants move to set aside the verdict and request judgment as a

matter of law pursuant to Fed. R. Civ. P. 50, or a new trial pursuant to Fed. R. Civ. P. 59,

or for remittitur of damages.  For the following reasons, Defendants' motion is DENIED.

### Factual Record[1]

　　The case centers on Shi's purchase of two luxury cars for which he paid over

$200,000 but that were never delivered.

　　Shi lives in Queens, New York and is a full-time student at Berkeley College in

Manhattan.  (Tr. at 50.)  His native language is Mandarin, and he used the services of an

interpreter for part of his trial testimony.  (Tr. at 29, 49.)

---

[1] The facts are those as presented at trial unless otherwise indicated.  "Tr." refers to the
trial transcript.

During summer 2014, Shi sought to purchase a 2014 Land Rover Range Rover.[2] (Tr. at 52-53.)  Using the website www.cars.com, Shi searched for and found the car in which he was interested.  (Tr. at 52-53.)  The cars.com listing for the 2014 Range Rover identified Land Rover of Chantilly, Virginia as the dealership.  (Tr. at 55.)  Shi called that dealership, where the operator connected him with salesman Gyamera.  (Tr. at 55.) Gyamera informed Shi that the 2014 Land Rover was available.  (Tr. at 55-56, 207.) Gyamera told Shi that Shi would have to come to the dealership in Virginia to purchase the car.  (Tr. at 203-04).

Shi complied and drove to Chantilly, Virginia.  (Tr. at 57-58.)  Once at the dealership, Shi saw the car he wanted, but the purchase fell through because Shi's license had expired.  (Tr. at 203-04.)  The car was then purchased by someone else.  (Tr. at 205-06.)  Shortly thereafter, according to Gyamera, the customer who purchased the car decided he no longer wanted it.  (Tr. 204, 245.)  Gyamera then introduced Shi to that customer so that Shi could purchase the car from him, which Shi did.  (Tr. at 89, 204-05, 245-46.)  Shi received delivery of the car without incident.  (Tr. at 59-60, 206.)  Gyamera testified that he made no money from Shi from this transaction, other than Shi giving him a gift of a fake Rolex watch.  (Tr. 248.)

In November 2014, Shi visited Gyamera in Virginia.  (Tr. 120, 122.)  According to Shi, Gyamera took Shi to the home of a person Gyamera identified as John Baron Royal. (Tr. at 122.)  Gyamera told Shi that Royal was a "big shot" who purchased numerous cars "all over the country" for resale.  (Tr. at 126.)   Gyamera also told Shi that Royal was

---

[2] Gyamera recalled this first purchase by Shi taking place in late 2013 or early 2014, not summer 2014.  (Tr. at 202, 243.)

trustworthy, that Gyamera and Royal lived near each other, and that Gyamera had known Royal for a long time.  (Tr. at 126.)  Either Royal, Gyamera, or both told Shi about Royal's wealth.  (*See* Tr. at 126, 209.)

Gyamera's testimony about Royal diverged significantly from Shi's.  According to Gyamera, Gyamera only found Royal because of Shi.  (Tr. at 206, 209.)  Specifically, in the summer of 2014, Shi called Gyamera to say Shi had found a Range Rover he wanted on AutoTrader.com and was having trouble contacting the person in the listing.  (Tr. at 207.)  Gyamera volunteered to call for Shi and in doing so learned that Royal was the person who listed the car.  (Tr. at 102-03.)  Coincidentally, it just so happened that Royal lived in the same town as Gyamera.  (Tr. at 104-05; 137.)

Further according to Gyamera, he called Shi to tell him about the Range Rover; Shi travelled to Virginia; and both Shi and Gyamera went to Royal's house to see the car. (Tr. at 207-08.)  At the house, they met Royal and saw the Range Rover that had been listed.  (Tr. at 209-10.)  Royal, however, said that the car already had been sold but that he could find another one.  (Tr. at 211.)  A month or two later, which Gyamera believes was the November 2014 visit recounted by Shi, Shi and Gyamera went to Royal's house again so that Shi could pay a $5,000 deposit on another Range Rover that Royal promised he could find.  (Tr. at 212-14.)  A few days later, that deal apparently fell through, and Royal returned Shi's $5,000 to Gyamera to give to Shi.[3]  (Tr. at 213-14.)

---

[3] During trial, Gyamera said he could provide proof of Shi's $5,000 deposit from his mobile phone (Tr. at 243), but no evidence of that nature was offered.

In February 2015, Shi purchased a second car through Gyamera, again from another purchaser (not Royal) introduced to Shi by Gyamera.[4]  (Tr. at 89-90, 174.)  Shi received delivery of that car as well.  (Tr. at 60-61, 69.)  Gyamera testified that he did not make any money from Shi in this second transaction.  (Tr. at 248-49.)

In early March 2015, Shi spoke with Gyamera about purchasing two additional cars – a 2015 Land Rover Range Rover and a 2015 Mercedes-Benz GL 450, each with specific trim requirements that were hard to find.[5]  (Tr. at 60-61, 90-93.)  Gyamera informed Shi that Gyamera had moved to an Infiniti dealership in Chantilly, Virginia.  (Tr. at 68-69; *see also* Tr. at 199-200.)  Gyamera also informed Shi that although Gyamera was working for an Infiniti dealership, he had various connections through which Shi would be able to purchase different car brands including Range Rover and Mercedes.  (Tr. at 69-70, 173-74.)  As Shi understood it, Gyamera "has the resources, he has the connections to promise me he would get me the car."  (Tr. at 73; *see also* Tr. at 91-92 (Gyamera told Shi that Gyamera was working on finding the two cars Shi wanted).)

Gyamera texted Shi pictures of the window stickers for a 2015 Range Rover and 2015 Mercedes.[6]  (Tr. at 62-65, 94.)  Shi responded to Gyamera, confirming that those were the cars Shi wanted.  (Tr. at 65.)  Shi then called Gyamera and asked if Gyamera had the cars and to which Gyamera replied affirmatively.  (Tr. 76-77.)  Gyamera told Shi

---

[4] Gyamera recalled this second purchase as occurring in 2014, not 2015.  (Tr. at 206-07.)

[5] Shi was purchasing the cars on behalf of family members for export to China.  (Tr. at 181-83.)

[6] Gyamera obtained the window stickers from Royal.  (Tr. at 218.)  Contrary to Shi's testimony, Gyamera testified that Shi knew "one hundred percent" that the stickers came from Royal based on Shi's having previously met Royal and Royal saying he could get the cars that Shi wanted.  (Tr. at 218-19.)

the price of the vehicles, to which Shi agreed.  (Tr. at 77, 95-96.)  Gyamera admitted that

the transactions for these cars were not conducted through his dealership.  (Tr. at 259-

60.)

On March 19 and 20, 2015, Shi sent two wires totaling $212,075 as payment for

the two cars.  (Tr. at 71-72, 76, 220, 224-25, 251.)  At Gyamera's direction, Shi wired the

funds to a bank account belonging to Gasandy, a corporate entity formed by Gyamera.[7]

(Tr. at 72-73, 96-97.)  In the two previous car transactions, Gyamera had not directed Shi

to send funds to Gasandy, but Shi trusted Gyamera based on the two earlier successful

purchases.  (Tr. at 96-97, 184-86.)

Gyamera told Shi that both cars would be delivered to Gyamera's home in Virginia

in a few days.  (Tr. at 74, 76.)  Accordingly, Shi drove to Virginia to visit Gyamera and

wait for the cars to be delivered.  (Tr. at 74.)  A few days passed without delivery, making

Shi anxious.  (Tr. at 78-80.)  Shi repeatedly asked Gyamera when the cars would be

delivered.  (Tr. at 78-79.)  On March 31, 2015, Gyamera instructed Shi to meet him at the

home of John Baron Royal.  (Tr. at 80.)  Shi did not know why he was asked to go to

Royal's home, but he did so.[8]  (Tr. at 80-81.)

---

[7] According to Gyamera, he formed Gasandy in connection with an effort to buy used car parts to send to Ghana.  (Tr. at 228-29.)  Gyamera admitted that he is the sole owner of Gasandy, that the address for Gasandy is his home address, and that he has complete control over Gasandy and its bank account.  (Tr. at 254-55.)

[8] At trial, defense counsel tried to impeach Shi, confronting him with the alleged fact that just the previous day Shi had testified that the March 2015 visit was the first time he met Royal and went to his house.  (Tr. at 130-37, 139-43.)  Shi firmly and consistently denied that had been his testimony the previous day.  The transcript bears out Shi's recollection.  (See Tr. at 80-82, 122, 142.)  Shi testified that the March 2015 encounter at Royal's house was the first time he understood that Royal had been involved in the purchase of the cars Shi had paid for; Shi did not testify that he had never met Royal before.  Defense counsel did reveal an inconsistency between Shi's testimony and his verified complaint with

When Shi arrived at Royal's house, he saw Gyamera and Royal having an argument.  (Tr. at 81.)  At some point, Gyamera told Shi that the cars were loaded on a delivery truck and being delivered from Florida to Virginia.  (Tr. at 78-79.)   When Shi again asked about the cars, Gyamera told him that the truck had had a flat tire and was running late.  (Tr. at 79.)  Gyamera testified that when he arrived at Royal's house he was concerned because the cars were not there; instead, a U-Haul moving truck was parked outside.  (Tr. at 229-30, 267-68.)  Suspecting that Royal was trying to leave, Gyamera blocked Royal's driveway.  (Tr. at 232, 268, 269-70.)

Police then showed up at Royal's house.  (Tr. at 82-83.)  Shi did not know who called the police, but Gyamera testified that he called them.  (Tr. at 82, 230.)  The police interviewed Gyamera and Royal, but, they did not interview Shi.  (Tr. at 83-84; *see also* Tr. at 230-33.)  According to the police report from that night, the occupant of the house, "John Kent," was moving out.  (Tr. at 83.)

A few days later, on April 3, 2015, Gyamera visited Shi at the hotel where Shi was staying in Virginia.  (Tr. at 84-85.)  According to Shi, Gyamera then proceeded to tell Shi what had happened.  (Tr. at 84-85.)  Gyamera told Shi that after receiving Shi's wire transfers, Gyamera transferred the money to a company named Cars by Cynthia and that

---

respect to when Shi first learned of Royal's involvement in purchase of the cars.  But Shi explained that the relevant portion of the complaint's language likely had been drafted by a previous attorney.  (Tr. at 144-45, 161-64.)  Shi also was forthright in testifying that he was trying his best to recall events from three years ago and that he might not remember everything precisely.  (Tr. at 144-47.)  In short, the jury was well within reason to find Shi credible.

Gyamera "turned to John [Baron Royal] to get cars from John."[9]  (Tr. at 85-86.)  After the meeting at Royal's house where the cars failed to materialize, Royal "disappeared."  (Tr. at 86.)  Shi testified that the April 3 meeting with Gyamera was when he finally understood that Cars by Cynthia and Royal were involved in acquiring the cars that Shi sought to purchase.  (Tr. at 86-87.)

After Shi returned to New York, Shi had further telephone discussions with Gyamera.  (Tr. at 102.)  According to Shi, Gyamera kept saying he would get the cars for Shi and asking him to be patient.  (Tr. at 102-03.)  Gyamera also told Shi that Gyamera had filed a police report and that the police were attempting to arrest Royal.  (Tr. at 103.)

Shi never received the two 2015 cars for which he paid.  (Tr. at 69.)  Gyamera testified that he has no idea what happened to the cars.  (Tr. at 234.)  A certificate of incorporation for Cars By Cynthia indicates an incorporation date of March 12, 2015, just a week before Shi wired money as directed by Gyamera.  (Tr. at 113-14.)  A CarFax report for a car with the same vehicle identification number as one of the window stickers that Gyamera sent to Shi in March 2015 shows that the car was shipped to China on February 8, 2015, more than a month earlier.  (Tr. at 117.)  From Shi's perspective, Gyamera "fooled me into buying something that was in nonexistence."  (Tr. at 119.)  Gyamera testified that "I think [Royal] scammed me."  (Tr. at 226.)

Of the $212,075 that Shi wired to Gyamera's company for purchase of the two cars, Gyamera wired most but not all of it to Cars By Cynthia; Gyamera retained $6,475

---

[9] According to Gyamera, Cars By Cynthia is a company owned by Royal, and Cynthia Stewart is Royal's wife.  (Tr. at 222-23.)  Gyamera testified that Shi authorized Gyamera to transfer the funds to Royal.  (Tr. at 220-21.)

in Gasandy's account.  (Tr. at 248, 251.)  According to Gyamera, Shi told Gyamera to keep that amount for himself.  (Tr. at 252.)  Gyamera considered the retained funds to be a commission to some extent and spent the money.[10]  (Tr. at 248, 256, 262-63.)

Shi conceded that he had no written contract with Gyamera.  (Tr. at 152.)  He faulted himself for not having a contract in writing but was adamant that he and Gyamera had come to an agreement.  (Tr. at 152, 178, 184-85.)  Whether the contract was for purchase of a car from Gyamera or for the services of Gyamera in locating and facilitating purchase of the car was the subject of varying testimony.[11]  Clarifying on redirect testimony, Shi testified that the agreement was that in exchange for the wired funds, Gyamera "would look for those two cars for me, that he will find those two vehicles for me and he will make a purchase on my behalf and he would deliver the vehicles to me."  (Tr. at 188-89.)

Gyamera, however, denied having any agreement with Shi and testified that he was just helping Shi as a friend.  (Tr. at 217-20.)  At the same time, however, Gyamera testified that he purchased the cars "on behalf of Shi" (Tr. at 224), that Shi wanted

---

[10] Gyamera's testimony about his retention of the $6,475 suggests that Shi told him he could keep that amount after the events of March 31, 2015 involving Royal and the police. (Tr. at 251-52.)  That timeline, however, is at odds with the fact that Shi wired funds exceeding the price of the cars, and Gyamera, via Gasandy, then transferred the lesser amount to Royal, via Cars By Cynthia.  In other words, Gyamera would have known at the time he quoted the price of the cars to Shi and received the funds from Shi in mid-March that the amount exceeded the amount Gyamera would have had to transfer for the two cars.  Yet Gyamera testified that the subject of the extra funds only came up after March 31, 2015.  (Tr. at 252.)

[11] *Compare, e.g.,* Tr. at 73 (Shi wired money to Gyamera's company bank account "because I was buying a car from him"); Tr. at 150 ("I went to the defendant to make a purchase"); Tr. at 166-67 ("I never purchased any vehicles from Royal.  I only, you know, make the purchase from Gyamera"; "all the purchases I made was through [Gyamera]"); Tr. at 179 (the agreement was "buying cars from" Gyamera).

Gyamera to "handle everything" because of language difficulty (Tr. at 272), and, consistent with Shi's testimony, that "[t]he job was to secure the vehicle, pay for it and everything.  And then when the car gets to John Royal's house, we [Gyamera and Shi] will go and pick it up."  (Tr. at 219.)

## Procedural Background

Shi filed this action on March 31, 2017.  Only Defendants Gyamera and Gasandy appeared.  The parties took no depositions and made no dispositive motions.  Prior to trial, the Court discussed with the parties the claims to be tried.  As a result of that conference, the claims tried were breach of contract, unjust enrichment, misrepresentation, and piercing the corporate veil of Gasandy.  Defendants objected to trial of any contract claim, arguing that Shi had not been able to identify the agreed upon terms of a contract.  Shi agreed that there was no written contract between the parties, however, Shi made a viable proffer of the terms of an express oral or implied contract.  Accordingly, and because Defendants had never moved for summary judgment, the Court permitted trial of the contract claim go forward.  Defendants reserved their right to make a motion for judgment as a matter of law following Shi's case.

A three-day jury trial took place September 27-29, 2018.  The only witnesses were Shi and Gyamera.  At the close of evidence, Defendants moved for judgment as a matter of law with respect to all claims.  (Tr. at 278-79.)  Other than eliminating the claim for misrepresentation by Gasandy (to which Shi's counsel acceded), the Court reserved ruling subject to renewal after a verdict.[12]  (Tr. at 288-89, 301-02.)

---

[12] Defendants timely met their obligations to move for judgment as a matter of law at the requisite junctures.  Plaintiff does not contend otherwise.

The parties largely agreed upon the jury instructions and verdict form, subject to Defendants' objection concerning there even being a contract.  Given the parties' dispute about the existence of a contract, the verdict sheet asked separate questions as to whether Shi had proved that the parties entered into agreement on the material terms of a contract and, if so, whether the Defendants breached the contract.  The Court instructed the jury as to the requirements for both express and implied contract.  (Tr. at 364-68.)

The jury deliberated for three-and-a-half hours and returned a unanimous verdict finding that Shi had proven agreement to the material terms of a contract and that both Gyamera and Gasandy breached the contract.  (Tr. 398-400.)  The jury found against Shi on his claim for negligent misrepresentation.  Having found breach of contract, the jury, as instructed, did not answer the verdict question addressing unjust enrichment.  The jury awarded damages of $170,000.  (*See* Jury Verdict Sheet, ECF No. 97.)

Defendants then filed the present motion, which focuses only on the breach of contract claims and the amount of damages.   Defendants put forth two principal arguments in support of their motion for judgment as a matter of law:  first, that there was no evidence of a contract, express or implied, as between Shi and either Defendant; and second, that if there was a contract, it was for the sale of goods and therefore barred by the statute of frauds in the absence of any written agreement.   (Def. Mem. at 5-7.) Defendants also argue, alternatively, for a new trial on the grounds that the verdict was against the clear weight of the evidence (Def. Mem. at 7), or that remitter is warranted because the damages awarded were excessive and based purely on speculation (Def. Mem. at 9-11).  As explained below, those arguments do not hold up.

**Discussion**

**A.    Defendants Are Not Entitled To Judgment as a Matter of Law**

  **1.    Standard for Judgment as a Matter of Law**

Pursuant to Federal Rule of Civil Procedure 50(a), a party is entitled to judgment as a matter of law if there is no "legally sufficient evidentiary basis" for a reasonable jury to find for the party on that issue.  Fed. R. Civ. P. 50(a); *Tse v. UBS Financial Services, Inc.*, 568 F. Supp. 2d 274, 286-87 (S.D.N.Y. 2008).  The bar to setting aside a jury verdict is high.  *Lavin-McEleney v. Marist College*, 239 F.3d 476, 479-80 (2d Cir. 2001); *Tse*, 568 F. Supp. 2d at 287.  A jury verdict should be set aside under Rule 50 "only when there is 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture,' or where there is 'such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against' [the movant].'"  *Tse*, 568 F. Supp. 2d at 287 (quoting *Kosmynku v. Polaris Industries, Inc.*, 462 F.3d 74, 79 (2d Cir. 2006)); *see also Lavin-McEleney*, 239 F.3d at 480; *DiSanto v. McGraw-Hill, Inc.*, 220 F.3d 61, 64 (2d Cir. 2000).

In considering the motion, the court must not make credibility assessments.  *Tse*, 568 F. Supp. 2d at 287 (citing *Gordon v. Matthew Bender & Co., Inc.*, 186 F.3d 183, 184 (2d Cir. 1999)); *Caruso v. Forslund*, 47 F.3d 27, 32 (2d Cir. 1995).  The court must view the evidence "in the light most favorable to the non-moving party" and "give that party the benefit of all reasonable inferences that the jury might have drawn in its favor from the evidence."  *Slack v. County of Suffolk*, 50 F. Supp. 3d 254, 262 (E.D.N.Y. 2014) (quoting *Concerned Area Residents for the Environment v. Southview Farm*, 34 F.3d 114, 117 (2d

Cir. 1994) (internal quotations, ellipses, and brackets omitted) *cert. denied*, 514 U.S. 1082 (1995)). A motion pursuant to Rule 50 "is thus 'proper only if the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable persons could have reached." *Slack*, 50 F. Supp.2d at 263 (quoting *Fiacco v. City of Rensselaer*, 783 F.2d 319, 329 (2d Cir. 1986) (internal quotations and brackets omitted)). "Such motions 'should be granted cautiously and sparingly.'" *Id.* (quoting 9A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2524, at 252 (1995)); *see also Japan Airlines Company Ltd. v. Port Authority of New York & New Jersey*, 178 F.3d 103, 112 (1999).

### 2.    Application

Defendants' base their bid for judgment as a matter of law essentially on two grounds: lack of any evidence of an agreed upon contract, and the statute of frauds bar to the extent any contract existed. The two questions are intertwined. Whether the statute of frauds is implicated depends on the terms of the alleged contract. The Court concludes that there is ample evidence to support a jury verdict finding formation of a contract and that the contract is not void under the statute of frauds.

### a.   The Parties Formed a Contract

The parties agreed that they had no written contract. The jury was instructed, however, that they could find either an express oral contract or an implied contract or no contract. A contract requires offer, acceptance, consideration, mutual assent and intent to be bound. *Leibowitz v. Cornell University*, 584 F.3d 487, 507 (2d Cir. 2009) ("To form a valid contract under New York law, there must be an offer, acceptance, consideration,

mutual assent and intent to be bound."); *Register.Com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (same).[13]  An oral contract is formed when the parties agree to terms through what was said despite the absence of a written agreement.  *See Powell v. Omnicon*, 497 F.3d 124, 129 (2d Cir. 2007) ("Parties may enter into a binding contract orally, and the intention to commit an agreement to writing, standing alone, will not prevent contract formation.") (citing *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir. 1985) (applying New York law)).

An implied contract is formed when it can be inferred from the parties' conduct. *See Ancile Investment Co. Ltd. v. Archer Daniels Midland Co.*, 784 F. Supp. 2d 296, 303 (S.D.N.Y. 2011) ("[C]ourts will also find a contract 'implied in fact' based on 'inference from the facts and circumstances of the case, . . . derived from the presumed intention of the parties as indicated by their conduct.'") (quoting *Leibowitz*, 584 F.3d at 506-07).  An implied-in-fact contract is "as binding as one that is express, and similarly 'requires such elements as consideration, mutual assent, legal capacity and legal subject matter.'" *Leibowitz*, 584 F.3d at 507 (quoting *Maas v. Cornell University*, 94 N.Y.2d 87, 94, 699 N.Y.S.2d 716, 720 (1999)).  None of the parties objected to the content of the instructions given on these charges.

The jury had more than a reasonable basis to find either that Shi and Gyamera formed an oral contract or that some combination of their words and actions gave rise to

---

[13] Both parties invoke New York law without tendering a choice of law analysis.  There are reasonable arguments for application of the law of either New York (where Shi lives, had phone calls with Gyamera and wired funds from) or Virginia (where Gyamera was situated, Shi visited and the cars were to be delivered).  However, the Court is not aware of any material differences between the two states with respect to the contract principles relevant to this dispute, and the parties have not offered any.

an implied contract.  For instance, although his testimony about the nature of the contract varied, Shi firmly testified that he had a contract with Gyamera for him to look for and facilitate purchase and delivery of two specific cars.  Gyamera conceded he agreed to do these things for Shi, although he claims he did so only as a friend.  And Gyamera in fact did the things that Shi says he agreed to do:  Gyamera found the cars that Shi wanted, sent the window stickers to Shi, accepted funds for payment of the cars, transferred the funds to an entity he understood to be formed by Royal, and met with Shi for delivery of the cars.  The only thing Gyamera did not do was ensure actual delivery of the cars, which Shi claims was a breach.

At the very least, the conduct of both Shi and Gyamera contains all the elements of a contract:  offer by Shi to pay for Gyamera's services to obtain the cars; acceptance by Gyamera's in executing what Shi bargained for; mutual assent and intent as manifested by those actions, and consideration in the form of $212,075.  *See Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568 (2d Cir. 1993) (A "unilateral offer may be accepted by the other party's conduct and thereby give rise to contractual obligations.").  "As the Second Circuit has noted, 'partial performance is an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it also understands a contract to be in effect.'"  *Michael Coppel Promotions Pty. Ltd. v. Bolton*, 982 F. Supp. 950, 954 (S.D.N.Y. 1997) (quoting *R.G. Group, Inc., v. Horn & Hardart Co.*, 751 F.2d 69, 75 (2d Cir. 1984)).

Alternatively, a reasonable jury could have concluded that Gyamera offered the two cars to Shi, such as when Gyamera forwarded the window stickers, and that Shi accepted the offer when he spoke with Gyamera over the phone confirming he wanted

the cars and would pay the quoted prices, or when he sent the funds to Gasandy's account as directed by Gyamera.  Gyamera's conclusory denials that he never had a contract with Shi do not trump the evidence of what the parties testified they actually did and said.  Any determination by the jury as to who to believe was a credibility assessment that cannot provide the basis for judgment as a matter of law.  *Gordon*, 186 F.3d at 184-85; *Caruso,* 47 F.3d at 32-33 (2d Cir. 1995); *see Tse*, 568 F. Supp. 2d at 287.

### b. The Contract is Not Barred by the Statute of Frauds

The statute of frauds requires that certain types of contracts be in writing and signed by the party to be charged.  Contracts that do not fall under an exception are void. N.Y. Gen. Oblig. Law § 5-701(a); *Kroshnyi v. U.S. Pack Courier Services, Inc.*, 771 F.3d 93, 110 (2d Cir. 2014) (citing statute).  In New York, the statute of frauds appears in two different statutes.  One is the Uniform Commercial Code § 2-201, which governs the sale of goods; the other is General Business Obligations law § 5-701.[14]  N.Y. U.C.C. Law § 2-201; N.Y. Gen. Oblig. Law § 5-701.

To the extent the jury found a contract for Gyamera to provide services to find and facilitate the purchase and delivery of the two cars, the contract may be construed as one for services performable within one year and not a contract for sale of goods that would otherwise be subject to the statutory bar.  *See, e.g., JB Aviation v. R Aviation Charter Services, LLC*, 143 F. Supp. 3d 37, 47 (E.D.N.Y. 2015) (statute of frauds did not bar oral contract for services in procuring airplane: "while certain types of brokerage agreements

---

[14] Again, regardless of which state's law applies, the outcome is the same; the statute of frauds of New York and Virginia are substantially similar.  *Compare* N.Y. Gen. Oblig. Law § 5-701 with Va. Code Ann. § 11-2; and N.Y. U.C.C. Law § 2-201 with Va. Code Ann. § 8.2-201.

must be in writing, agreements to pay compensation for services rendered in the sale of goods, such as airplanes are not among them") (internal quotation omitted); *Gentile v. Conley*, 636 F. Supp. 2d 246, 253 (S.D.N.Y. 2009) (same); *see also Robins v. Zwirner*, 713 F. Supp. 2d 367, 375-76 (S.D.N.Y. 2010) (explaining that "where a service component of a contract 'predominates' over the incidental sale of personal property, an oral agreement is barred by the Statute of Frauds only if it is incapable of being performed within one year" but finding contract barred because it predominantly was for rights to purchase paintings in the future).

To the extent the contract may be construed as predominantly one in which Shi agreed to pay Gyamera for two cars, the contract would be for the sale of goods and ordinarily void under the statute of frauds. Yet, if the contract between Gyamera and Shi is subject to the statute of frauds, it falls under an exception and would not be void. That is because Gyamera accepted the funds that Shi paid. The statute of frauds expressly exempts contracts "with respect to goods for which payment has been made and accepted." N.Y. U.C.C. § 2-201(c)(3). That exception squarely applies here. *See, e.g.*, *Niedernhofer v. Wittels*, No. 17 Civ. 4451, 2018 WL 3650137, at *4 (S.D.N.Y. July 31, 2018) (denying motion to dismiss and recognizing that exception for payment made and accepted for luxury car delivered with material defects would likely apply if allegations were proved); *Seven Seas Trading Co. v. Nan Hong Farm, Inc.*, No. 96 Civ. 7249, 1997 WL 370590, at *2-3 (S.D.N.Y. July 1, 1997) (Sotomayor, J.) (explaining and applying N.Y. U.C.C. 2-201(c)(3) exception in context of partial payment for goods); *Thomaier v. Hoffman Chevrolet, Inc.*, 64 A.D.2d 492, 496-97, 410 N.Y.S.2d 645, 648-49 (2d Dep't

1978) (acceptance of down payment for car rendered oral contract enforceable under U.C.C. 2-201(c)(3)).

Accordingly, Defendants are not entitled to judgment as a matter of law; the record establishes a valid, enforceable contract.[15]

## B.    Defendants are Not Entitled to a New Trial

### 1.    Standard for a New Trial

Federal Rule of Civil Procedure 59(a)(1) permits a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  In the Second Circuit, a motion for a new trial may be granted "when, in the opinion of the district court, the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice."  *DLC Management Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998) (internal quotations, citations, and ellipses omitted).  The standard for a new trial is less onerous than that for judgment as a matter of law in at least two respects:  "(1) a new trial may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner."  *Tse*, 568 F. Supp. 2d at 287 (citing *DLC Management*, 163 F.3d at 133-34).  However, "a court should rarely disturb a jury's evaluation of witness credibility."  *Id.* (citing *DLC Management*, 163 F.3d at 134).  "[T]he mere fact that the trial judge disagrees with the jury's verdict is not a

---

[15] Defendants suggest that there also was no contract with Gasandy, as distinct from Gyamera, because Shi's dealings, other than transmission of funds, was with Gyamera. (Def. Mem. at 5.)  That is a moot point that the Court need not address, however, because the jury found a basis for piercing Gasandy's corporate veil and Defendants have not challenged that aspect of the verdict.

sufficient basis to grant a new trial." *Id.* at 287 (citing *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 691 (2d Cir. 1983)).

### 2.    Application

As set forth earlier, the jury had considerable evidence from which to conclude that Shi and Gyamera agreed on Shi's wiring funds in exchange for Gyamera's services in finding and facilitating purchase and delivery of two luxury cars.  Gyamera accepted the receipt of funds in full, but the cars were never delivered.  There were a modest number of documents introduced at trial – wire transfers, copies of the texts of the window stickers sent by Gyamera, the police report, research performed by Shi, and a few others.  The documents largely tended to corroborate Shi.  But most of the trial was devoted to testimony from two witnesses who provided divergent accounts of what happened.  Both witnesses had some inconsistencies in their testimony, and both were subject to vigorous cross examination.  The trial thus turned considerably on the jury's assessment of witness credibility.

This court cannot say that the jury could not reasonably have credited Shi more, or even far more, than Gyamera.  For instance, the jury may well have found the "coincidence" that the telephone number Shi found for the Range Rover listing in which he was interested just happened be the number for a person, Royal, who lived in the same town as Gyamera.  Nor does this court conclude that the verdict was seriously erroneous or a miscarriage of justice.  To the contrary, it was undisputed that Shi paid over two hundred thousand dollars to Gyamera to be used for the purchase and delivery of vehicles that never materialized.

Defendants no doubt believe the verdict is a miscarriage of justice since, according to Gyamera, he was duped by Royal just as much as was Shi.  The jury was within reason not to believe that, however, as there was no proof other than Gyamera's say-so and his having called the police.  Even if Gyamera was a victim along with Shi and may have had his own claims against Royal, he would not be absolved of liability for his obligations to Shi.

## C.    There is No Basis for Remittitur

### 1.    Standard for Remittitur

As an alternative to a new trial, remittitur can be used to compel the prevailing party to "choose between reduction of an excessive verdict and a new trial."  *Tse*, 568 F. Supp. 2d at 287 (quoting *Cross v. New York City Transit Authority*, 417 F.3d 241, 258 (2d Cir. 2005) (internal quotation marks omitted)).  The court may require a choice between a new trial and reduction of a damages verdict "where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken," or "where the award is intrinsically excessive in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error."  *Id.* (quoting *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 337 (2d Cir. 1993) (citation and internal quotation marks omitted)).  Remittitur may also be warranted when defendants can demonstrate "that the jury awarded specific amounts of damages that were not supported by the record."  *Id.* (citing *Trademark Research Corp.*, 995 F.2d at 337).

When, as here, assessing a damages amount awarded for claims under state law, a federal court must apply the law of the state.  *Gasparini v Center for Humanities*, *Inc.*,

518 U.S. 415, 419, 431 (1996).  Under New York law, which the parties both cite as the governing law for the claims in this case, awards require reduction when they "deviate materially from what would be reasonable compensation" for the claims and injuries at issue.  *Id.,* 518 U.S. at 423-25 (discussing N.Y.C.P.L.R. 5501(c)).

### 2.    Application

Shi paid $212,075 for Gyamera to find and facilitate the purchase and delivery of two cars that he did not receive.  The jury awarded $170,000, more than forty thousand dollars less than Shi's out-of-pocket loss.  It is not clear how the jury arrived at that specific figure.  But there is no basis to conclude that a reasonable jury could not have awarded that lesser amount.  Nor is there any basis to conclude that the award "deviates materially" from other breach of contract cases where plaintiffs seek to be made whole.  *See, e.g., Process America, Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 143 (2d Cir. 2016) ("Damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract.") (quoting *Oscar Gruss & Son, Inc. v. Hollander,* 337 F.3d 186, 196 (2d Cir. 2003)).

Defendants contend that the award is merely speculative because Shi never disclosed whether the money he paid was actually his and consequently whether Shi suffered a loss.  (Def. Mem. at 10.)  This is an odd and fruitless argument.  Shi testified that the money he used came from family members.  (Tr. at 150.)  But he wired the money from his own bank account to Gasandy.  (Tr. at 72.)  How Shi obtained that money is irrelevant.  And there was no evidence that Shi was ever reimbursed by anyone for the money he wired to Gasandy.

**Conclusion**

For the foregoing reasons, Defendants' motion for judgment as a matter of law, a new trial, or remittitur is DENIED.  Judgment shall be entered on behalf of Plaintiff against Defendants Gyamera and Gasandy Ventures in the amount of $170,000.

SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:      December 6, 2018
             New York, New York

Copies transmitted to all counsel of record.